UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| Sustainable Restaurant Holdings, Inc., *et al.*,[1] | ) | Case No. 20-11087 (___) |
|  | ) |  |
| Debtors. | ) | (Joint Administration Requested) |
|  | ) |  |

**DEBTORS' MOTION SEEKING ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING THE DEBTORS TO OBTAIN SENIOR AND JUNIOR SECURED
SUPERPRIORITY POSTPETITION FINANCING; (II) GRANTING LIENS AND
SUPERPRIORITY ADMINISTRATIVE EXPENSE CLAIMS; (III) AUTHORIZING
USE OF CASH COLLATERAL; (IV) MODIFYING THE AUTOMATIC STAY;
(V) SCHEDULING A FINAL HEARING; AND (VI) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "Debtors")[2]

respectfully submit this motion (the "Motion")[3] for the relief set forth herein.  In support of hereof,

the Debtors rely upon the First Day Declaration and the *Declaration of David Campbell in Support*

---

[1]   The Debtors in these Chapter 11 Cases, along with the last four digits of each of the Debtors' respective federal tax identification numbers, are as follows: Sustainable Restaurant Holdings, Inc. (6430); SRG Operations, LLC (0486); Quickfish LLC (7391); Bamboo Sushi, LLC (9009); Quickfish Pearl District LLC (9060); Quickfish SW Stark, LLC (1879); Quickfish Slabtown, LLC (7391); Quickfish Avanti (Bamboo Sushi Avanti, LLC) (9009); Bamboo Sushi NE Alberta, LLC (7610); Bamboo Sushi Lake Oswego, LLC (9484); Bamboo Sushi SW 12th, LLC (7382); Bamboo Sushi Denver Lo-Hi, LLC (4045); Bamboo Sushi NW 23rd, LLC (1361); Bamboo Sushi Seattle Cap Hill, LLC (9009); Bamboo Sushi U Village Seattle, LLC (9052); Bamboo Sushi Embarcadero SF, LLC (5837); Bamboo Sushi Bishop Ranch, LLC (3763); Bamboo Sushi Kierland Scottsdale, LLC (0483); Bamboo Sushi Commissary Kitchen, LLC (2194); Bamboo Sushi Biltmore Phoenix, LLC (9412); Bamboo Sushi Valley Fair, LLC (2887); Bamboo Sushi Washington Square, LLC (5066).  The Debtors' headquarters address is: 920 SW 6th Avenue, Suite 1200, Portland, OR 97204 and mailing address is: PO Box 3347, Portland, OR 97208. The Debtors operate restaurants under the following names: Bamboo Sushi and Quickfish.

[2]   A detailed description of the Debtors and their businesses, and the facts and circumstances supporting this motion and the Debtors' chapter 11 cases, are set forth in greater detail in the *Declaration of Matthew Park in Support of Debtors' First Day Motions and Applications* (the "First Day Declaration"), filed contemporaneously with the Debtors' voluntary petitions for relief filed under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), on May 12, 2020 (the "Petition Date").

[3]   Capitalized terms used but not defined herein shall have the meanings given to them in the Interim Order or the DIP Term Sheet, as applicable, both of which are defined below.

*of the DIP Motion* (the "Campbell Declaration"), filed contemporaneously herewith.  In further

support of this DIP Motion, the Debtors respectfully state as follows:

## RELIEF REQUESTED

1.     The Debtors seek entry of an interim order, substantially in the form attached hereto

as **Exhibit A** (the "Interim Order"), and a final order (the "Final Order"[4] and, together with the

Interim Order, the "DIP Orders"):

(a)     authorizing Sustainable Restaurant Holdings, Inc. (the "DIP Borrower") to obtain postpetition financing pursuant to the DIP Facility (as defined below), and for each of the DIP Borrower's direct and indirect subsidiaries as guarantors (the "DIP Guarantors," and, together with the DIP Borrower, the "DIP Obligors") to guarantee unconditionally on a joint and several basis, and subject to the terms and limitations set forth herein and in the term sheet attached hereto as Exhibit A (the "DIP Term Sheet") in all respects, the DIP Borrower's obligations under the DIP Facility, consisting of a senior secured super-priority multi-draw term loan credit facility (the "DIP Facility"), on the terms and conditions set forth in the DIP Term Sheet (as the same may be amended, restated, amended and restated, supplemented, waived, extended, or otherwise modified from time to time, and, together with any other related agreements, documents, security agreements, or pledge agreements, including the Interim Order and the Final Order, collectively, the "DIP Loan Documents"), by and among the DIP Obligors and Bain Capital Double Impact Fund, LP, BCIP Double Impact Associates, L.P., and Kitchen Fund, LP (collectively, the "DIP Secured Parties"), in an aggregate principal amount of $1,900,000 in term loan commitments which shall be available as term loans (the "DIP Loans") to the DIP Borrower upon entry of the Interim Order and satisfaction of the other conditions set forth therein in an initial amount not to exceed $375,000.00 (the "Initial DIP Loan"), and the remainder of the DIP Facility available upon entry of the Final Order to the extent set forth therein;

(b)     authorizing the Debtors to execute, deliver, and enter into the DIP Loan Documents and to perform all of the Debtors' respective obligations thereunder, and such other and further acts as may be required in connection with the DIP Loan Documents;

(c)     authorizing the Debtors to pay all amounts, obligations, and liabilities owing or payable to the DIP Secured Parties pursuant to the DIP Loan Documents, including, without limitation, any principal, interest, fees, commitment fees, administrative agent fees, audit fees, closing fees, service fees, facility fees, or other fees, costs, expenses, charges, and disbursements of the respective DIP Secured Parties

---

[4]     The Debtors will file a proposed Final Order prior to the Final Hearing.

(including the reasonable and documented fees and expenses of each of the DIP Secured Parties' attorneys, advisors, accountants, and other consultants), any obligations in respect of indemnity claims, whether contingent or absolute, including, without limitation, any and all obligations in connection with any interest rate, currency swap, or other hedging agreement or arrangement, in each case, to the extent constituting all Debtors and/or DIP Guarantors obligations of any kind under the DIP Loan Documents (such obligations collectively, the "<u>DIP Obligations</u>");

(d)     authorizing the Debtors, immediately upon entry of the Interim Order, to use proceeds of the DIP Facility as expressly provided in the DIP Loan Documents and solely in accordance with the Interim Order and the applicable Approved Budget (as defined below) (subject to permitted variances and other exclusions set forth in the DIP Loan Documents) to:  (A) pay costs, premiums, fees, and expenses related to the above-captioned cases (the "<u>Case</u>") and in connection with the DIP Facility; and (B) provide financing for working capital and for other general corporate purposes of the Debtors in accordance with the Approved Budget (subject to permitted variances and other exclusions set forth in the DIP Loan Documents); and granting and approving of superpriority administrative expense claim status, pursuant to sections 364(c)(1), 503(b)(1), and 507(b) of the Bankruptcy Code, to the DIP Secured Parties, in respect of all DIP Obligations, subject only to the Carve Out (as defined below);

(e)     granting to the DIP Secured Parties of valid, enforceable, non-avoidable, automatically and fully perfected DIP Liens in all DIP Collateral, including, without limitation, any "cash collateral" as such term is defined in section 363(a) of the Bankruptcy Code (the "<u>Cash Collateral</u>"), to secure the DIP Obligations, which DIP Liens shall be subject to the relative rankings and priorities set forth herein and in the other DIP Loan Documents;

(f)     modification of the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the Interim Order and the other DIP Loan Documents to the extent hereinafter set forth;

(g)     subject to entry of a Final Order, waiver of the Debtors' ability to surcharge pursuant to section 506(c) of the Bankruptcy Code against any DIP Collateral and certain rights of the Debtors under the "equities of the case" exception in section 552(b) of the Bankruptcy Code;

(h)     waiver of any applicable stay (including under Bankruptcy Rule 6004) and providing for immediate effectiveness of the Interim Order; and

(g)     scheduling of a final hearing on the Motion (the "<u>Final Hearing</u>") to consider entry of the Final Order granting the relief requested in the Motion on a final basis and approving the form of notice with respect to the Final Hearing.

3

## PRELIMINARY STATEMENT[5]

2.      Immediate access to incremental liquidity in the form of postpetition financing (as well as access to Cash Collateral) is vital to preserving the value of the Debtors' estates and to maximizing the likelihood of a successful sale process.  The Debtors will suffer immediate and irreparable harm absent access to additional liquidity.

3.      As described in the First Day Declaration, the Debtors commenced these chapter 11 cases to conduct a prompt sale of all or substantially all of their assets or other restructuring through a plan with the goal of maximizing achievable value for all stakeholders.  Consummation of a sale transaction or restructuring as soon as possible is in the best interests of the Debtors' estates.  The Debtors' ability to access additional liquidity through the available DIP Facility is necessary to support the sale process contemplated.

4.      In an effort to support the financial needs of their ongoing business, the Debtors engaged BMO Capital Markets ("BMO") in March 2020 to seek either debt or equity investors or a sale of the Debtors' business.  BMO reached out to over 30 parties.  While several parties executed confidentiality agreements and received confidential information and conducted due diligence, it became clear that the needed incremental financing was not available in the current market conditions.

5.      Given the deteriorating financial and cash position of the Debtors, it became apparent that a bankruptcy or other insolvency process was likely needed. To continue the marketing process through any such process, in the beginning of May 2020, the Debtors retained SSG Capital Advisors LLC ("SSG") to continue the marketing process for the Debtors' business

---

[5]    Capitalized terms used but not defined herein have the meanings ascribed to them in the DIP Term Sheet, or the Interim Order, as applicable.

through a chapter 11 process. The Debtors also reached out to certain of their current equity investors to determine their interest in providing financing in connection with the filing of these chapter 11 cases and the continued pursuit of a sale or restructuring process by the Debtors. In addition to the efforts of BMO, the Debtors, with the assistance of their financial advisors Getzler Henrich & Associates LLC, also solicited proposals for alternative debtor-in-possession financing from a variety of third-party potential lenders, including at least five financial institutions.  No other actionable proposal or indication of interest in a debtor-in-possession financing facility was provided to the Debtors other than the proposed DIP Facility by the DIP Lenders.

6.      As explained in the First Day Declaration, after significant back and forth, the DIP Lenders agreed to provide $1,900,000 of new money postpetition financing, including $375,000 during the interim period and additional $1,525,000 upon entry of the Final Order.

7.      As discussed below, in the Campbell Declaration and in the First Day Declaration, the provisions of the DIP Term Sheet and the Interim Order were negotiated at arm's-length and in good faith, and the proposed DIP Facility provides the best terms presently available to the Debtors.  The Debtors firmly believe that incurrence of the DIP Facility will allow the Debtors to continue operations while in chapter 11, including paying their existing employees, vendors, landlords, and satisfying other working capital and operational requirements, and is in the exercise of the Debtors' sound business judgment.  Satisfaction of these key obligations is necessary to preserve and maintain the value of the Debtors' estates while the Debtors pursue their sale or restructuring process.  Accordingly, the Debtors have an immediate need to obtain postpetition or "DIP" financing and to use their Cash Collateral and, therefore, the Debtors respectfully request that the Court approve the entry of the Interim Order and the Final Order.

## JURISDICTION AND VENUE

8.     The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  The Debtors confirm their consent, pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

9.     Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

10.     The statutory bases for the relief requested herein are sections 105, 361, 362, 363, 364, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, and 9014, and Local Rules 2002-1(b) and 4001-2.

## BACKGROUND

### I.     The Debtors' Prepetition Capital Structure.

11.     As of the Petition Date, the Debtors' capital structure, on a consolidated basis, consists of an outstanding unsecured note in the principal amount of approximately $1,499,800, unsecured trade debt of $910,000, and other potential unsecured debt of approximately $1,690,000, exclusive of potential lease termination claims.

## II.     Alternative Sources of Financing Are Not Readily Available.

12.     Given the financial condition of the Debtors, they do not have alternative sources of financing readily available.  *See*  Campbell Declaration ¶¶ 13-14.  Additionally, the Debtors', through their professionals, reached out to at least five parties for a variety of financing solutions— yielding no actionable results.  Accordingly, the Debtors do not believe third-party debtor-in-possession financing would be reasonably obtainable other than that proposed under the DIP Facility.

13.     While simultaneously determining the interest of the DIP Lenders in providing the DIP Facility, the Debtors, with the assistance of their advisors, began soliciting indications of interest from at least five alternative third-party sources of debtor-in-possession financing (including specialty lenders, distressed-oriented investors with experience in retail, and those that routinely provide debtor-in-possession financing), to gauge their interest in providing postpetition financing to the Debtors.  *See*  Campbell Declaration ¶ 13. No other party provided an actionable proposal for alternative financing.  *See id.*

## <u>MATERIAL TERMS OF THE DIP FACILITY</u>

14.     Bankruptcy Rule 4001(c)(1)(B) and Local Rule 4001-2 (a)(ii) require that a motion for authority to obtain credit list or summarize, and set out the location within the relevant documents, all material provisions of the proposed credit agreement and form of order, including interest rate, maturity, events of default, liens, borrowing limits and borrowing conditions. The principal terms of the DIP Facility are as follows[6]:

---

[6]     The summaries contained in this motion are qualified in their entirety by the provisions of the documents referenced, including the DIP Term Sheet, the Interim Order and the other DIP Loan Documents.  To the extent anything in this motion is inconsistent with such documents, the terms of the applicable documents shall control.  Capitalized terms used in this summary chart but not otherwise defined have the meanings ascribed to them in the DIP Term Sheet, the Interim Order or other DIP Loan Documents, as applicable.

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| **Borrowers**<br>Bankruptcy Rule 4001(c)(1)(B) | Sustainable Restaurant Holdings, Inc. |
| **Guarantors**<br>Bankruptcy Rule 4001(c)(1)(B) | All other Debtors. |
| **DIP Lenders**<br>Bankruptcy Rule 4001(c)(1)(B) | Bain Capital Double Impact Fund, LP, BCIP Double Impact Associates, L.P. and Kitchen Fund, LP |
| **Term**<br>Bankruptcy Rule 4001(b)(l)(B)(iii), 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | The earliest of (a) 120 days after entry of the Interim Order (or such later date as the DIP Lenders in their sole discretion may agree in writing with the Borrower); (b) the consummation of a sale of all or substantially all of the assets of the DIP Loan Parties; (c) acceleration of the DIP Loans pursuant to the DIP Term Sheet or the Financing Orders; (d) 30 days after entry of the Interim Order (or such later date as the DIP Lenders in their sole discretion may agree in writing with the Borrower) if the Final Order has not been entered on or prior to the expiration of such 30-day period; and (e) the substantial consummation (as defined in section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date" thereof) of a plan of reorganization filed in the Chapter 11 Cases that is confirmed pursuant to an order entered by the Bankruptcy Court. |
| **Commitment**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | Up to $1,900,000 under a multi-draw term loan DIP Facility with up to $375,000 of the DIP Facility (the "<u>Interim DIP Loan</u>") funded upon entry of the Interim Order and  the remainder to be funded consistent with the Budget (as defined below) upon entry of the Final Order. |
| **Conditions of Borrowing**<br>Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | The closing of the DIP Facility and extensions of credit thereunder are subject to satisfaction of usual and customary conditions precedent set forth in the DIP Term Sheet, including entry of the Interim Order. |
| **Interest Rates**<br>Bankruptcy Rule 4001(c)(1)(B)<br>Local Rule 4001-2(a)(ii) | Interest shall accrue at the rate of Libor + 4% per annum (or, if less, at the highest rate then permitted by applicable law) (subject to a 0.00% Libor floor), and shall be payable monthly, on the first (1st) business day of each month, in arrears, in accordance with the Budget.  All accrued interest which for any reason has not theretofore been paid shall be paid in full on the date on which the final principal amount of the DIP Loans is paid.<br><br>During any Event of Default, the applicable rate *plus* 1.0%. |
| **Use of DIP Financing Facility and Cash Collateral** | For (a) working capital and general corporate purposes, including capital expenditures, of the Debtors and, to the extent funded through intercompany loans evidenced by promissory notes pledged to the DIP Lenders to secure the DIP Obligations on a first-priority basis in accordance with the Financing Orders, their direct and indirect |

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| **Bankruptcy Rule** 4001(b)(l)(B)(ii)<br><br>Local Rule 4001-2(a)(ii) | subsidiaries; and (b) bankruptcy-related costs and expenses (including the pursuit and consummation of a sale and Plan, all consistent with the DIP Term Sheet, including the Budget), subject to the Carve-Out. |
| **Adequate Protection** Bankruptcy Rules 4001(b)(l)(B)(iv), 4001(c)(1)(B)(ii) | **Superpriority Claims**:   All claims under the DIP Facility shall be entitled to superpriority claim status in the Chapter 11 Cases (which claims shall be payable from and have recourse to all DIP Collateral, subject to the Carve-Out.<br><br>**Credit Bidding:** The Financing Orders shall authorize the DIP Lenders to credit bid any amounts outstanding under the DIP Facility in any sale of the DIP Collateral, including under sections 363 and 1123 of the Bankruptcy Code.  Any such credit bid may provide for the assignment of the right to purchase the acquired assets to a sub-agent or a newly-formed acquisition vehicle. |
| **Liens & Priority**<br><br>Bankruptcy Rule 4001(c)(l)(B)<br><br>Local Rule 4001-2(a)(ii) | All of the claims of the DIP Lenders under the DIP Facility with respect to the DIP Loans and the DIP Obligations shall at all times:<br><br>1.  pursuant to section 364(c)(1) of the Bankruptcy Code, be entitled to superpriority claim status in the Chapter 11 Cases (which claims shall be payable from and have recourse to all DIP Collateral) (subject to the Carve-Out);<br><br>2.  pursuant to section 364(c)(2) of the Bankruptcy Code, be secured by a perfected first priority lien on all DIP Collateral other than all property of the Debtors that is subject to valid and perfected liens in existence at the time of the commencement of the Chapter 11 Cases or subject to valid liens in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by section 546(b) of the Bankruptcy Code (the "<u>Prior Senior Liens</u>"); and<br><br>3. pursuant to section 364(c)(3) of the Bankruptcy Code, be secured by a perfected junior lien on all DIP Collateral of the Debtors that is subject to a Prior Senior Lien. |
| **Repayment Features** Local Rule 4001-2(a)(i)(E) | No later than the effective date of a Plan, the DIP Claims shall be indefeasibly paid in full in cash; *provided* that the DIP Lenders shall have, with the Debtors' consent, the option to equitize their DIP Claims at their sole discretion. |
| **Fees** Bankruptcy Rule 4001(c)(1)(B)<br><br>Local Rule 4001-2(a)(ii) | **Commitment Fee:**  3% fee on all commitments under the DIP Facility to be fully earned and accrued upon entry of the Interim Order, and payable upon the earlier of (a) any prepayment, repayment, or refinancing of the DIP Facility and (b) the consummation of a sale of the DIP Collateral.<br><br>**Exit Fee:**  3% exit fee on all funded amounts and outstanding commitments under the DIP Facility, payable upon the earlier of (a) any prepayment, repayment, or refinancing of the DIP Facility and (b) the consummation of a sale of the DIP Collateral. |
| **Budget** Bankruptcy Rule 4001 (c)(1)(B) Local Rule 4001-2(a)(ii) | All advances, and the use of funds provided, under the DIP Facility shall be subject to and consistent with a customary budget to be agreed by DIP Lenders and the Borrower attached as <u>Exhibit A</u> to the Interim Order. |

9

| Bankruptcy Rule | Summary of Material Terms |
|---|---|
| **Budget Covenant (Variances & Reporting)**<br><br>Bankruptcy Rule 4001(c)(l)(B)<br><br>Local Rule 4001-2(a)(ii) | Rolling 13-week cash flow forecasts to be provided every four weeks with weekly variance analysis. Monthly and quarterly P&L for the business.<br><br>The DIP Loan Parties' senior management and their legal and financial advisors shall conduct a telephonic conference call at least once a week, or as reasonably requested by the DIP Lenders, to discuss the Budget, any variance or related reports delivered in connection with the Budget, and the financial condition, performance, and business affairs of the Company. |
| **Events of Default**<br>Bankruptcy Rule 4001(c)(l)(B)<br><br>Local Rule 4001-2(a)(ii) | Usual and customary for financings of this type, including non-payment of obligations, defaults under covenants, breaches of representations and warranties, defaults related to the budget, invalidity of collateral documents, change of control, invalidity of postpetition loan documents, failure to achieve any of the Required Milestones the occurrence of any number of adverse actions or consequences in any of the chapter 11 cases. |
| **Costs and Expenses:**<br>Bankruptcy Rule 4001(c)(1)(B)(ix) | All reasonable and documented professional fees and out-of-pocket expenses incurred by the DIP Lenders (including, but not limited to, the fees and expenses of the DIP Lenders' counsel) shall be promptly paid by the DIP Loan Parties on no less than a monthly basis. The DIP Lenders (and their affiliates and respective officers, directors, employees, advisors and agents) (each such person, an "***Indemnitee***") will have no liability for, and will be indemnified and held harmless against, any losses, claims, damages, liabilities or expenses incurred in respect of the financing contemplated hereby or the use or the proposed use of proceeds thereof, except to the extent they are found by a final, non-appealable judgment of a court of competent jurisdiction to arise from the gross negligence or willful misconduct of the relevant indemnified person. |
| **Milestones:**<br>Bankruptcy Rule 4001(c)(1)(B) | Achieve each of the following Required Milestones:<br><br>(a) Filing of a plan of reorganization that is reasonably acceptable to the DIP Lenders (the "Plan") no later than 10 days after the entry of the Interim Order; and<br>(b) Entry of an order confirming the Plan that is reasonably acceptable to the DIP Lenders no later than 60 days after the Petition Date. |
| **Release:**<br>Bankruptcy Rule 4001(c)(l)(B)(viii) | The Final Order shall provide for a release and exculpation by the DIP Loan Parties of the DIP Lenders and each of their respective current and former affiliates, and such entities' and their current and former affiliates' current and former directors, managers, officers, principals, members, employees, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals with respect to any and all claims or causes of action the Debtors may have against such parties. |

## **HIGHLIGHTED PROVISIONS PURSUANT TO LOCAL RULE 4001-2**

15.     The DIP Facility includes certain provisions the Debtors are required to highlight

pursuant to Local Rule 4001-2(a)(i) as set forth below.  As discussed in detail herein, the Debtors

believe these provisions are reasonable in light of the facts and circumstances of these chapter 11 cases and should be approved.

16.     **Cross Collateralization**:  Pursuant to Local Rule 4001-2(a)(i)(A)a movant must identify any provisions that grants cross-collateralization protections.  The DIP Facility does <u>not</u> contain any cross-collateralization provisions.

17.     **Validity, Perfection and Amount of Prepetition Obligations**: Pursuant to Local Rule 4001-2(a)(i)(B), a movant must identify any provisions that contain findings of fact that bind the estate or other parties in interest with respect to the validity, perfection or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor.  The DIP Facility does <u>not</u> contain any such provisions.

18.     **Committee Challenge Period**: Local Rule 4001-2(a)(i)(B) also requires disclosure of the challenge period with respect to the Debtors' Stipulations.  Here, there is no committee so the DIP Facility does <u>not</u> contain any such provisions. However, the Final Order shall provide for a release and exculpation by the DIP Loan Parties of the DIP Lenders and each of their respective current and former affiliates, and such entities' and their current and former affiliates' current and former directors, managers, officers, principals, members, employees, equity holders (regardless of whether such interests are held directly or indirectly), predecessors, successors, assigns, subsidiaries, agents, advisory board members, financial advisors, partners, attorneys, accountants, investment bankers, consultants, representatives, and other professionals with respect to any and all claims or causes of action the Debtors may have against such parties.

19.     **Waiver of Section 506(c) of the Bankruptcy Code**: Local Rule 4001-2(a)(i)(C) requires disclosure of provisions that constitute a waiver, *without notice*, of whatever rights the estate may have under section 506(c) of the Bankruptcy Code.  The Interim Order provides that

the waiver of any rights under section 506(c) of the Bankruptcy Code is <u>subject to entry of the</u> <u>Final Order</u>.  Because this waiver only will be effective upon entry of the Final Order and to the extent such order so provides, the Debtor respectfully submits that parties in interest will have an opportunity to be heard and, as such, the waiver will not be "without notice," but the Debtor discloses the provision out of an abundance of caution.

20.     **Liens on Avoidance Actions**: Local Rule 4001-2(a)(i)(D) requires disclosure of provisions that provide for immediate liens on actions under sections 544, 545, 547, 548 and 549 of the Bankruptcy Code.  Here, <u>solely upon entry of the Final Order</u> will DIP Liens be granted on such actions.

21.     **Roll-Up Provisions**: Pursuant to Local Rule 4001-2(a)(i)(E)), a movant must identify any roll-up provisions.  The DIP Facility does <u>not</u> contain any such provisions.

22.     **Carve-Out**: Local Rule 4001-2(a)(i)(F) requires disclosure of *disparate* treatment between the professionals retained by the Debtor and the professionals retained by the unsecured creditors' committee, if any, with respect to a professional fee carve out.  Budgeted professional fees comprise the primary component of the Carve-Out.  The Budget provides different amounts for Debtor professionals.  The Debtors submit the proposed amounts are common in cases of similar size before the Court, accurately account for the increased administrative tasks required of Debtors' professionals and are reasonable and appropriate under the circumstances.

23.     **Nonconsensual Priming**: Pursuant to Local Rule 4001-2(a)(i)(G), a movant must identify any provisions that seek to prime any secured lien without the consent of that lienor.  The DIP Facility does <u>not</u> provide for any nonconsensual priming.

24.     **Waiver of Section 552(b)(1)**: Pursuant to Local Rule 4001-2(a)(i)(H), a movant must identify any provisions that seek to affect the Court's power to consider the equities of the

12

case under 11 U.S.C. § 552(b)(1).  Solely <u>upon entry of the Final Order</u>, the DIP Lenders shall

each be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and the

"equities of the case" exception under section 552(b) of the Bankruptcy Code shall not apply to

the DIP Lenders with respect to proceeds, product, offspring or profits of any of the DIP Collateral.

The Debtors believe that such relief is often provided, and appropriate, upon entry of the Final

Order.

25.    The DIP Lenders would not have agreed to provide the DIP Facility and consented

to the use of Cash Collateral, each of which was heavily negotiated among the various parties.

Moreover, as discussed below, these provisions are justified under the circumstances.  Finally, the

Debtors determined in their sound business judgment, that agreeing to such provisions was

appropriate under the circumstances of these chapter 11 cases to afford the Debtors immediate and

much needed liquidity to fund, on the most competitive terms available, their ongoing operations

and the sale process in these chapter 11 cases.

**BASIS FOR RELIEF**

**I.      The Debtors Should Be Authorized to Obtain Postpetition Financing Through the DIP Facility.**

**A.      Entry into the DIP Facility and DIP Loan Documents Is an Exercise of the Debtors' Sound Business Judgment.**

26.    The Court should authorize the Debtors, as an exercise of their sound business

judgment, to enter into the DIP Loan Documents, obtain access to the DIP Facility, and continue

using Cash Collateral.  Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured

or superpriority financing under certain circumstances discussed in detail below.  Courts grant a

debtor-in-possession considerable deference in acting in accordance with its business judgment in

obtaining postpetition secured credit, so long as the agreement to obtain such credit does not run

13

afoul of the provisions of, and policies underlying, the Bankruptcy Code. *See, e.g.*, *In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving a postpetition loan and receivables facility because such facility "reflect[ed] sound and prudent business judgment"); *In re L.A. Dodgers LLC*, 457 B.R. 308, 313 (Bankr. D. Del. 2011) ("[C]ourts will almost always defer to the business judgment of a debtor in the selection of the lender."); *In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-interest.").

27.     Specifically, to determine whether the business judgment standard is met, a court need only "examine whether a reasonable businessperson would make a similar decision under similar circumstances." *In re Exide Techs.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006); *see also In re Curlew Valley Assocs.*, 14 B.R. 506, 513–14 (Bankr. D. Utah 1981) (noting that courts should not second guess a debtor's business decision when that decision involves "a business judgment made in good faith, upon a reasonable basis, and within the scope of [the debtor's] authority under the [Bankruptcy] Code").

28.     Furthermore, in considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Elingsen McLean Oil Co., Inc.*), 65 B.R. 358, 365 n.7 (W.D. Mich. 1986) (recognizing a debtor may have to enter into "hard bargains" to acquire funds for its reorganization). The Court may also

14

appropriately take into consideration non-economic benefits to the Debtors offered by a proposed postpetition facility.  For example, in *In re ION Media Networks. Inc.*, the bankruptcy court for the Southern District of New York held that:

> Although all parties, including the Debtors and the Committee, are naturally motivated to obtain financing on the best possible terms, a business decision to obtain credit from a particular lender is almost never based purely on economic terms.  *Relevant features of the financing must be evaluated, including non-economic elements such as the timing and certainty of closing, the impact on creditor constituencies and the likelihood of a successful reorganization.* This is particularly true in a bankruptcy setting where cooperation and establishing alliances with creditor groups can be a vital part of building support for a restructuring that ultimately may lead to a confirmable reorganization plan.  That which helps foster consensus may be preferable to a notionally better transaction that carries the risk of promoting unwanted conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009) (emphasis added).

29.    The Debtors' determination to move forward with the DIP Facility is an exercise of their sound business judgment following a search for other viable and actionable alternatives and an arm's-length process and careful evaluation.  Specifically, the Debtors and their advisors determined that postpetition financing will create certainty with respect to cash flows necessary for the administration of these chapter 11 cases through a sale or restructuring process.  The Debtors negotiated the DIP Facility with the DIP Lenders in good faith, at arm's length, and with the assistance of their respective advisors.  The Debtors conducted intensive negotiations with the DIP Lenders that resulted in the proposed DIP Facility, which provides reasonable milestones for the Debtors to conduct an appropriate sale and restructuring process.  Given the Debtors' capital structure and current circumstances, the Debtors believe that they have obtained the best financing available.  Accordingly, the Court should approve the DIP Facility and authorize the Debtors'

entry into the DIP Loan Documents, as it is a reasonable exercise of the Debtors' business judgment.

**B.      The Debtors Should Be Authorized to Grant Liens and Superpriority Claims.**

30.      The Debtors propose to obtain financing under the DIP Facility by providing security interests and liens as set forth in the DIP Loan Documents pursuant to section 364(c) of the Bankruptcy Code.  Specifically, the Debtors propose to provide to the DIP Secured Parties postpetition security interests in and liens on the DIP Collateral (as defined in the Interim Order) that are valid, perfected, allowed, enforceable, non-avoidable and not subject to challenge, dispute or subordination immediately upon entry of the Interim Order, as follows:

> DIP Liens on the DIP Collateral securing the DIP Obligations shall have and are hereby granted (i) junior, perfected security interests in and liens upon any assets of the DIP Obligors that are subject to valid, perfected, enforceable and unavoidable security interests as of the Petition Date  and (ii) superpriority perfected security interests in and liens upon all property and assets of the DIP Obligors as of now or hereafter arising or acquired that are not otherwise subject to valid, perfected, enforceable, and unavoidable security interests.

 *See* Interim Order at p. 16.

31.      The statutory requirement for obtaining postpetition credit under section 364(c) is a finding, made after notice and hearing, that a debtor is "unable to obtain unsecured credit allowable under Section 503(b)(1) of [the Bankruptcy Code]."  11 U.S.C. § 364(c).  *See In re Crouse Grp., Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (secured credit under section 364(c) of the Bankruptcy Code is authorized, after notice and hearing, upon showing that unsecured credit cannot be obtained).  Courts have articulated a three-part test to determine whether a debtor is entitled to financing under section 364(c) of the Bankruptcy Code.  Specifically, courts look to whether:

(a)  the debtor is unable to obtain unsecured credit under section 364(b) of the Bankruptcy Code, *i.e.*, by allowing a lender only an administrative claim;

(b)  the credit transaction is necessary to preserve the assets of the estate; and

(c)  the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and proposed lenders.

*See In re Los Angeles Dodgers LLC*, 457 B.R. 308 (Bankr. D. Del. 2011); *In re Ames Dep't Stores*, 115 B.R. 34, 37–40 (Bankr. S.D.N.Y. 1990); *see also In re St. Mary Hosp.*, 86 B.R. 393, 401-02 (Bankr. E.D. Pa. 1988); *Crouse Grp.*, 71 B.R. at 549.

32.    As described above and as set forth in the Campbell Declaration, third-party lenders were unwilling to provide postpetition financing on an unsecured basis or other basis. *See* Campbell Declaration ¶¶ 13-14.

33.    Absent the DIP Facility, which will provide certainty that the Debtors will have sufficient liquidity to administer these chapter 11 cases and to continue operating their business, the value of the Debtors' estates would be significantly impaired to the detriment of all stakeholders.  Given the Debtors' circumstances, the Debtors believe that the terms of the DIP Facility, are fair, reasonable, and adequate, all as more fully set forth below.  For all these reasons, the Debtors submit that they have met the standard for obtaining postpetition financing.

34.    In the event that a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, section 364(c) provides that a court "may authorize the obtaining of credit or the incurring of debt (1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of [the Bankruptcy Code]; (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien." As described

17

above, the Debtors are unable to obtain unsecured credit.  Therefore, approving superpriority claims in favor of the DIP Secured Parties is reasonable and appropriate.

35.    Further, section 364(d) provides that a debtor may obtain credit secured by a senior or equal lien on property of the estate already subject to a lien, after notice and a hearing, where the debtor is "unable to obtain such credit otherwise" and "there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted."  11 U.S.C. § 364(d)(1).  The Debtors may incur "priming" liens under the DIP Facility if either (a) the Prepetition Secured Parties have consented or (b) Prepetition Lenders' interests in collateral are adequately protected.  *See, e.g.*, *Anchor Savs. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 122 (N.D. Ga. 1989) ("[B]y tacitly consenting to the superpriority lien, those [undersecured] creditors relieved the debtor of having to demonstrate that they were adequately protected.").

36.    Here the DIP Facility is not seeking to prime any existing valid, enforceable and unavoidable liens as of the Petition Date.  The Debtors submit that its provision of adequate protection as described herein is fair and reasonable and satisfies the requirements of section 364(d)(1)(B) of the Bankruptcy Code.

**B.    No Comparable Alternative to the DIP Facility Is Reasonably Available.**

37.    A debtor need only demonstrate "by a good faith effort that credit was not available without" the protections afforded to potential lenders by sections 364(c) of the Bankruptcy Code. *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *see also In re Plabell Rubber Prods., Inc.*, 137 B.R. 897, 900 (Bankr. N.D. Ohio 1992).  Moreover, in circumstances where only a few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky*

18

*Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), *aff'd sub nom. Anchor Sav. Bank FSB v. Sky Valley, Inc.*, 99 B.R. 117, 120 n.4 (N.D. Ga. 1989); *see also In re Snowshoe Co.*, 789 F.2d 1085, 1088 (4th Cir. 1986) (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); *In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (bankruptcy court's finding that two national banks refused to grant unsecured loans was sufficient to support conclusion that section 364 requirement was met); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

38.    As noted above, the Debtors do not believe that viable, alternative sources of financing are reasonably available given the realities imposed by the Debtors' business and the Debtors' unsuccessful solicitation of alternative financing proposals.  Indeed, the Debtors have searched for actionable alternative proposals—in this regard, the market has spoken.  There are no other options.  Thus, the Debtors have determined that the DIP Facility provides the best opportunity available to the Debtors under the circumstances to fund these chapter 11 cases. *See* First Day Declaration ¶ 12; Campbell Declaration ¶¶ 13-14, 17.  Therefore, in addition to evidence to be introduced at the hearing on the Interim Order if necessary, the Debtors submit that the requirement of section 364 of the Bankruptcy Code that alternative credit on more favorable terms be unavailable to the Debtors is satisfied.

## II.    The Debtors Should Be Authorized to Use Cash Collateral.

39.    Section 363 of the Bankruptcy Code generally governs the use of estate property. Section 363(c)(2)(A) permits a debtor in possession to use cash collateral with the consent of the secured party.  Here, the DIP Lenders consent to the Debtors' use of the Cash Collateral (as well as the DIP Collateral), subject to the terms and limitations set forth in the Interim Order.

PHIL1 8869416v.4

40.     Section 363(e) provides for adequate protection of interests in property when a debtor uses cash collateral.  Further, section 362(d)(1) of the Bankruptcy Code provides for adequate protection of interests in property due to the imposition of the automatic stay.  *See In re Cont'l Airlines*, 91 F.3d 553, 556 (3d Cir. 1996) (*en banc*).  While section 361 of the Bankruptcy Code provides examples of forms of adequate protection, such as granting replacement liens and administrative claims, courts decide what constitutes sufficient adequate protection on a case-by-case basis.  *In re Swedeland Dev. Grp., Inc.*, 16 F.3d 552, 564 (3d Cir. 1994); *In re Satcon Tech. Corp.*, No. 12-12869 (KG), 2012 WL 6091160, at *6 (Bankr. D. Del. Dec. 7, 2012); *In re N.J. Affordable Homes Corp.*, No. 05-60442 (DHS), 2006 WL 2128624, at *14 (Bankr. D.N.J. June 29, 2006); *In re Columbia Gas Sys., Inc.*, Nos. 91-803, 91-804, 1992 WL 79323, at *2 (Bankr. D. Del. Feb. 18, 1992); *see also In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D.N.H. 1993) (citing 2 Collier on Bankruptcy ¶ 361.01[1] at 361–66 (15th ed. 1993) (explaining that adequate protection can take many forms and "must be determined based upon equitable considerations arising from the particular facts of each proceeding").

41.     As set forth in the Interim Order, the Debtors propose to provide the DIP Lenders with  adequate protection in the form of the DIP Liens and Superpriotrity Claims.

42.     Therefore, the Debtors submit that the proposed adequate protection is sufficient to protect the Prepetition Secured Parties from any diminution in value to the Cash Collateral and  is necessary to protect against any diminution in value but is fair and appropriate under the circumstances of these chapter 11 cases to ensure the Debtors are able to continue using the Cash Collateral, subject to the terms and limitations set forth in the Interim Order, for the benefit of all parties in interest and their estates.

PHIL1 8869416v.4

### III.    The Debtors Should Be Authorized to Pay the Fees Required by the DIP Agent and the DIP Lenders Under the DIP Loan Documents.

43.    Under the DIP Loan Documents, the Debtors have agreed, subject to Court approval, to pay certain fees to the DIP Lenders consisting of the following:

(a)    Commitment Fee: 3% fee on all commitments under the DIP Facility to be fully earned and accrued upon entry of the Interim Order and earned on the final amount upon entry of the Final Order, and payable upon the earlier of (a) any prepayment, repayment, or refinancing of the DIP Facility and (b) the consummation of a sale of the DIP Collateral; and

(b)    Exit Fee: 3% exit fee on all funded amounts and outstanding commitments under the DIP Facility, payable upon the earlier of (a) any prepayment, repayment, or refinancing of the DIP Facility and (b) the consummation of a sale of the DIP Collateral.

44.    Under the circumstances of these cases, these fees and costs are reasonable, customary, and appropriate.  Accordingly, the Court should authorize the Debtors to pay the fees provided under the DIP Loan Documents in connection with entering into those agreements. *See* Campbell Declaration ¶ 14.

### IV.    The DIP Lenders Should Be Deemed Good-Faith Lenders Under Section 364(e).

45.    Section 364(e) of the Bankruptcy Code protects a good-faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Section 364(e) of the Bankruptcy Code provides that:

The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

21

46.    As explained herein, in the Campbell Declaration and the First Day Declaration, the DIP Loan Documents are the result of: (a) the Debtors' reasonable and informed determination that the DIP Secured Parties offered the most favorable terms on which to obtain vital postpetition financing, and (b) arms'-length, good-faith negotiations between the Debtors and the DIP Secured Parties. The Debtors submit that the terms and conditions of the DIP Loan Documents are reasonable and appropriate under the circumstances, and the proceeds of the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code. Further, no consideration is being provided to any party to the DIP Loan Documents other than as described herein. Accordingly, the Court should find that the DIP Secured Parties are "good faith" lenders within the meaning of section 364(e) of the Bankruptcy Code and are entitled to all of the protections afforded by that section.

## V.    The Automatic Stay Should Be Modified on a Limited Basis.

47.    The proposed Interim Order provides that the automatic stay provisions of section 362 of the Bankruptcy Code will be modified to allow the DIP Lenders to file any financing statements, security agreements, notices of liens, and other similar instruments and documents in order to validate and perfect the liens and security interests granted to them under the Interim Order. The proposed Interim Order further provides that the automatic stay is modified as necessary to permit the Debtors to grant the DIP Liens to the DIP Secured Parties and to incur all liabilities and obligations set forth in the Interim Order. Finally, the proposed Interim Order provides that, following the occurrence of an Event of Default, the automatic stay shall be modified to the extent necessary to permit the DIP Lenders to exercise all rights and remedies in accordance with the DIP Loan Documents, or applicable law.

48.     Stay modifications of this kind are ordinary and standard features of debtor-in-possession financing arrangements, and, in the Debtors' business judgment, are reasonable and fair under the circumstances of these chapter 11 cases.  *See, e.g.*, *In re Magnum Hunter Res. Corp.*, No. 15-12533 (KG) (Bankr. D. Del. Dec. 15, 2015) (terminating automatic stay after event of default); *In re Peak Broad., LLC*, No. 12-10183 (PJW) (Bankr. D. Del. Feb. 2, 2012) (terminating automatic stay after occurrence of termination event); *In re TMP Directional Mktg., LLC*, No. 11-13835 (MFW) (Bankr. D. Del. Jan. 17, 2012) (modifying automatic stay as necessary to effectuate the terms of the order); *In re Broadway 401 LLC*, No. 10-10070 (KJC) (Bankr. D. Del. Feb. 16, 2010) (same); *In re Haights Cross Commc'ns, Inc.*, No. 10-10062 (BLS) (Bankr. D. Del. Feb. 8, 2010) (same).

## VI.   Failure to Obtain Immediate Interim Access to the DIP Facility and Cash Collateral Would Cause Immediate and Irreparable Harm.

49.     Bankruptcy Rules 4001(b) and 4001(c) provide that a final hearing on a motion to obtain credit pursuant to section 364 of the Bankruptcy Code or to use cash collateral pursuant to section 363 of the Bankruptcy Code may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the Court may conduct a preliminary, expedited hearing on the motion and authorize the obtaining of credit and use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate.

50.     For the reasons noted above, the Debtors have an immediate postpetition need to use Cash Collateral and access additional liquidity under the DIP Facility.  The Debtors cannot maintain the value of their estates during the pendency of these chapter 11 cases without access to this liquidity.  The Debtors will use cash to, among other things, fund the administration of these chapter 11 cases and the operation of their business.  The Debtors will be unable to operate their business or otherwise fund these chapter 11 cases without access to the DIP Facility and Cash

Collateral and will suffer immediate and irreparable harm to the detriment of all creditors and other parties in interest. In short, the Debtors' ability to administer these chapter 11 cases through the use of Cash Collateral and access to additional financing is vital to preserve and maximize the value of the Debtors' estates.

51.     The Debtors request that the Court hold and conduct a hearing to consider entry of the Interim Order authorizing the Debtors, from and after entry of the Interim Order until the Final Hearing, to receive immediate authorization to use Cash Collateral and initial funding under the DIP Facility. This relief will enable the Debtors to preserve and maximize value and, therefore, avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, pending the Final Hearing.

## REQUEST FOR FINAL HEARING

52.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date for the Final Hearing that is as soon as practicable, and in no event more than 30 days after the Petition Date, and fix the time and date prior to the Final Hearing for parties to file objections to this motion.

## WAIVER OF BANKRUPTCY RULE 6004(A) AND 6004(H)

53.     To implement the foregoing successfully, the Debtors request that the Court enter an order providing that notice of the relief requested herein satisfies Bankruptcy Rule 6004(a) and that the Debtors have established cause to exclude such relief from the 14-day stay period under Bankruptcy Rule 6004(h).

## NOTICE

54.     The Debtors will provide notice of this motion to: (a) the Office of the U.S. Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors

(on a consolidated basis); (c) counsel to the DIP Lenders; (d) the United States Attorney's Office for the District of Delaware; (e) the Internal Revenue Service; (f) the United States Securities and Exchange Commission; (g) the state attorneys general for all states in which the Debtors conduct business; (h) all known parties that have asserted a lien on the Debtors' assets; and (i) any party that requests service pursuant to Bankruptcy Rule 2002. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

<u>**NO PRIOR REQUEST**</u>

55.     No prior request for the relief sought in this motion has been made to this or any other court.

WHEREFORE, the Debtors respectfully request that the Court enter the DIP Orders, granting relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Dated: May 12, 2020
Wilmington, Delaware

*/s/ Domenic E. Pacitti*

**KLEHR HARRISON HARVEY BRANZBURG LLP**
Domenic E. Pacitti (DE Bar No. 3989)
Michael W. Yurkewicz (DE Bar No. 4165)
Sally E. Veghte (DE Bar No. 4762)
919 N. Market Street, Suite 1000
Wilmington, DE 19801
Telephone: (302) 426-1189
Facsimile: (302) 426-9193

-and-

**KLEHR HARRISON HARVEY BRANZBURG LLP**
Morton R. Branzburg (*pro hac vice admission pending*)
1835 Market Street, 14th Floor
Philadelphia, PA 19103
Telephone: (215) 569-2700
Facsimile: (215) 568-6603

*Proposed Attorneys for the Debtors*

25